UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                              Case No. 8:08-bk-16972-KRM
                                                    Chapter 11
COLONY BEACH & TENNIS
CLUB ASSOCIATION, INC.,

           Debtor.

_____/

COLONY BEACH & TENNIS
CLUB ASSOCIATION, INC.,

           Plaintiff,

vs.                                                 Adv. Pro. No.: 8:08-ap-00568-KRM

COLONY BEACH & TENNIS CLUB, INC.,
COLONY BEACH, INC., WILLIAM W.
MERRILL, TRUSTEE OF THE WILLIAM W.
MERRILL REVOCABLE TRUST, AND
CAROLYN L. FIELD, TRUSTEE OF THE
CAROLYN L. FIELD FAMILY TRUST,

           Defendants.

_____/

**MEMORANDUM OPINION AND
ORDER ON DEBTOR'S OBJECTIONS TO
CLAIM NO. 16 OF COLONY BEACH, INC., DEBTOR'S
OBJECTIONS TO CLAIM NO. 19 OF WILLIAM W. MERRILL,
TRUSTEE OF THE WILLIAM W. MERRILL REVOCABLE TRUST,
DEBTOR'S OBJECTIONS TO CLAIM NO. 20 OF CAROLYN L. FIELD,
TRUSTEE OF THE CAROLYN L. FIELD FAMILY TRUST, DEBTOR'S
OBJECTIONS TO CLAIM NO. 21 OF COLONY BEACH & TENNIS CLUB,
INC. AND COLONY BEACH, INC. AND DEBTOR'S AMENDED COMPLAINT**

**THIS PROCEEDING** came before this Court for trial on May 18 and 19, 2009.  In this

Chapter 11 case, the Court must determine whether the claims asserted against the Debtor,

Colony Beach & Tennis Club Association, Inc. (the "**Association**" or the "**Debtor**"), relating to

a controversial Recreational Facilities Lease (the "**Lease**") should be allowed.  If any claims are allowed, the Court must also determine the allowed amount of the claims.

The Association, a not-for-profit corporation, never actually made any payments of rent under the Lease.  (5/18/09 Tr. 74:20-75:6.)  The Association does not have the right to exercise, and it has never exercised, any control over the use of the leased premises under the Lease (the "**Property**"). Instead, the Property has always been controlled, used and occupied as an integral part of the hotel (the "**Hotel**") operated by Colony Beach & Tennis Club, Ltd. (the "**Partnership**").  The Partnership paid, out of the Hotel revenues, all lease payments under the Lease until October 2008.   (5/18/09 Tr. 74:20-75:6.)   With the consent of the lessors, the Partnership has remained in control of and has continued to use the Property throughout these proceedings in the operation of the Hotel.  The Partnership is controlled by Dr. Murray J. Klauber ("**Dr. Klauber**").  (Ex. 6; 5/18/09 Tr. 20:20-22.)

Dr. Klauber also owns and controls Colony Beach, Inc. ("**CBI**"), the owner of a 35% interest in the Lease, and Colony Beach & Tennis Club, Inc. (the "**Manager**"), the owner of a 45% interest in the Lease. (Ex. 6.)  The remaining interest in the Lease is owned 5% by William W. Merrill, Trustee of the William W. Merrill Revocable Trust ("**Merrill**") and 15% by Carolyn L. Field, Trustee of the Carolyn L. Field Family Trust ("**Field**").  CBI, the Manager, Merrill and Field are collectively referred to as the "**Lessors**."

On February 19, 2008, the Association commenced a state court action (the "**Recreational Lease Action**"), filing a complaint against the Lessors seeking (a) declaratory judgment that the Lease is unconscionable as a matter of law, (b) declaratory relief that the rent escalation clause in the Lease is void and unenforceable, and (c) damages from the Lessors for breach of the Lease.  On November 5, 2008, the Association removed the Recreational Lease

Action to this Court as Adversary Proceeding No. 8:08-ap-568-KRM.  (Doc. No. 1.)

The Association filed a motion to reject the Lease at the outset of this case.  (Doc. No. 23.)  This Court entered an order approving and authorizing the Debtor's request to reject the Lease (Doc. Nos. 75 and 106), and establishing January 20, 2009, as the bar date for entities to file proofs of claim for any claims arising out of the rejection of the Lease.  By further order of the Court, the bar date for filing claims arising out of the rejection of the Lease was extended until February 4, 2009.  (Doc. No. 107.)

The following claims were filed asserting damages as a result of the Debtor's rejection of the Lease (collectively, the "**Claims**"):  (a) Claim No. 16 of CBI; (b) Claim No. 19 of Merrill; (c) Claim No. 20 of Field; (d) Claim No. 21 of CBI and the Manager; and (e) the Motion for Allowance and Payment of Administrative Rent Claim filed by Field and Merrill (Doc. No. 134).  The Claims seek (i) an aggregate amount of $2,228,487 for damages arising out of the Debtor's rejection of the Lease, based on the computation of annual rent of approximately $653,000 per year for three years, together with certain amounts for taxes and insurance, and (ii) amounts for rent due for the period between the filing of this case and the Association's rejection of the Lease.  On April 13, 2009, the Association filed an amended complaint in this adversary proceeding (the "**Amended Complaint**") objecting to the allowance of the Claims.

For the reasons stated orally and recorded in open court on August 10, 2009, which shall constitute the decision of the Court, as supplemented by the following written findings of fact and conclusions of law, the objections to Claim No. 16, Claim No. 19, Claim No. 20 and Claim No. 21 are sustained, the Claims of the Lessors are disallowed in their entirety, and the declaratory relief sought by the Association that the Lease is unconscionable and unenforceable is granted.

## FINDINGS OF FACT

**A.     Description of The Colony.**

The Association is a not-for-profit corporation formed in 1973. (Ex. 10.)   The Association was established as a condominium association pursuant to the Declaration of Condominium of Colony Beach & Tennis Club, dated November 29, 1973 (the "**Declaration**"). (Ex. 16.) The Association's membership consists of the owners of 237 condominium units (the "**Unit Owners**") at the condominium identified as Colony Beach & Tennis Club, a Condominium Resort Hotel ("**The Colony**").  (Ex. 10 at § 4.1.)  The Unit Owners have no right to use or occupy their units or the Property except as guests of the Hotel and then only for up to thirty days each year.  (Ex. 19 at §§ 10.1 and 10.2.)

Concurrently with the establishment of the condominium, the Partnership was formed to operate and manage the condominium units at The Colony as rental accommodations in the operation of the Hotel.  (Ex. 19 at § 10.1.)  Dr. Klauber is the president and principal of Resorts Management, Inc., the general partner of the Partnership (the "**General Partner**"). (Ex. 6 and 7.) All but five Unit Owners are limited partners in the Partnership and are required to make their units at The Colony available for occupancy by third parties as rental accommodations for the Hotel. (Ex. 19 at § 10.1.)   All management decisions respecting the Hotel are made by the General Partner. (Ex. 19 at § 7.1.) The Declaration provides that the Unit Owners, who have made the use of their units available to the Partnership, will be relieved of paying assessments to the extent that the Partnership makes such payments and assumes all other responsibilities of such Unit Owners. (Ex. 16 at § 7.2.) A similar provision is in the Bylaws of the Association. (Ex. 11 at § 6.5.)

Colony Beach Associates, Ltd. ("**CBA**") was formed in 1972 by Dr. Klauber and his then partner, Joseph Penner ("**Penner**"). (Ex. 21 at 5-6.)  CBA initially sold the condominium units at

The Colony together with limited partnership interests in the Partnership. (Ex. 21 at 1, 5.)  In the sales literature, Dr. Klauber promoted that the General Partner would bear a fiduciary responsibility to the limited partners and that the General Partner would "be bound to act in the highest good faith to the [l]imited [p]artners," and would "not obtain any advantage over them by misrepresentation, concealment, threat or adverse pressure of any kind." (Ex. 21 at 7-8, 29 at 14, 35 at 14, 37 at 14.)

On September 30, 1975, after defaulting on its loans to acquire and develop The Colony, CBA conveyed its interest in The Colony to CBI.  (Ex. 29 at 6.)  At the time, CBI was a Florida corporation formed by First City Federal Savings & Loan Association and First Federal Savings & Loan Association of Tarpon Springs (the "**S&L's**").  *Id*.  The new owner/developer, CBI, thereafter began selling the remaining condominium units at The Colony.  *Id*.

Dr. Klauber and certain other individuals then formed Colony Investors, Inc. ("**Investors**"), a Michigan corporation, to reacquire The Colony by purchasing the S&L's equity in CBI.  This was accomplished on September 8, 1977.  (Ex. 37 at 5-6.)

B. **Assemblage of the Recreational Facility Property.**

On September 12, 1972, CBA acquired approximately eighteen acres of real estate located on the Gulf of Mexico at Longboat Key, Florida from Herbert and Rebecca Field. (Ex. 248.) When The Colony was formed, Dr. Klauber intentionally excluded from the Declaration four separate, non-contiguous parcels of the land, aggregating 3.186 acres (the "**Land**") comprising Parcel A (improved then and now with a pool area), Parcel B (intended for development of tennis courts, but then containing certain buildings now used by the Hotel), Parcel C (intended to become and became tennis courts), and Parcel D (intended to become and became tennis courts).  (Ex. 15; Ex. 247.)

CBA also retained ownership of certain of the accessory units within The Colony that

were included as part of the Declaration. (Ex. 8.) Two of these accessory units are described as (a) the Locker Room Unit B and Meeting Room (collectively, "**Unit B**") and (b) the Club House Unit D ("**Unit D**"). Dr. Klauber combined the Land, Unit B and Unit D, all owned by CBA, to assemble the Property. (Ex. 8 and 9.) Dr. Klauber then made the Property available for exclusive use by the Hotel pursuant to the Lease. (Ex. 15.)

**C.      Ownership of the Property.**

The original lessor, CBA, has not held any interest in the Lease for decades. Dr. Klauber, through a series of transactions, assigned undivided interests in the Lease and the Property to two of his companies, the Manager (45%)[1] and CBI (35%),[2] and to Field (15%)[3] and Merrill (5%).[4]

**D.      The Lease.**

Dr. Klauber and his then lawyer, William W. Merrill, dictated the terms of the Lease for both the lessor and the Association. (Ex. 10 and 15.) Dr. Klauber and Penner, as the general partners of CBA, and Penner, as the president of the Association, signed the Lease. (Ex. 15 at 19.) By design, Dr. Klauber, Penner, and William W. Merrill controlled the Association's board of directors until December 31, 1977. (Ex. 10 at §§ 5.3 and 5.4.)

The Lease has a term of 99 years, expiring in 2072. (Ex. 15 at § 2.) The Lease requires the Association to pay taxes on, insure, and maintain the Property with absolutely no obligations required of the Lessors. (Ex. 15 at §§ 6.4, 7.1, 7.2, and 7.4.) In the event of default, the Lease

---

[1] On or about April 8, 1974, CBA transferred an undivided 45% interest to First Diversified Properties, Inc., a subsidiary of the S&L's. (Ex. 23.) That interest was ultimately transferred to the Manager in 1980. (Ex. 55.) The Manager is a company owned by Dr. Klauber that was established to be the manager of the Association and served in that capacity until the summer of 2007. (Ex. 6.) The Manager is also the entity that operates the food and beverage operations for Dr. Klauber at the Hotel. *Id.*

[2] On November 4, 1975, CBA transferred a 35% interest to CBI. (Ex. 251.)

[3] On or about July 8, 1974, CBA transferred an undivided 15% interest to Herbert P. Field and Colony Beach Club, Inc. of Longboat, as tenants in common. (Ex. 25.) That interest was ultimately transferred to Field in 1986. (Ex. 127.)

[4] On or about April 8, 1974, CBA transferred an undivided 5% interest to William W. Merrill. (Ex. 24 and 26.) That interest was ultimately transferred to Merrill in 2008. (Ex. 233 and 234.)

purports to permit the Lessors to place a lien on the individual Unit Owners' condominium units. (Ex. 15 at § 9.3.) The Declaration requires that all subsequent Unit Owners assume the obligations under the Lease.  (Ex. 16 at § 4.4.)

The Lease expressly provides that "[n]o modification, release or discharge or waiver of any provision hereof shall be of any force, effect, or value unless in writing, signed by the Lessor." (Ex. 15 at § 22.18.) The Declaration prohibits any amendment which "attempt[s] to change the obligations of the Association and unit owners under [the Lease] . . . , unless the lessor under the said lease and record owners of the fee simple title to the land subject thereto shall join in the execution of the amendment . . . ." (Ex. 16 at § 15.4.) The Declaration requires that any amendment to the Lease must be formally approved by the Association and provides that "[a] copy of each amendment shall be attached to a certificate certifying that the amendment was duly adopted, which certificate shall be executed by all officers of the Association with all the formalities of a deed. The amendment shall be effective when such certificate and a copy of the amendment are recorded in the public records of Sarasota County, Florida." (Ex. 16 at § 15.5.)

**E.    Value of the Leased Premises in 1973.**

The original developer, CBA, sold the first condominium unit in December of 1973.  The second developer, CBI, began selling the bulk of the condominiums after January 23, 1976. (Ex. 29.)  These developers sold units at The Colony together with limited partnership interests in the Partnership pursuant to several prospectuses that were filed and qualified with the U.S. Securities and Exchange Commission (each a "**Prospectus**" and, collectively, the "**Prospectuses**").  The following financial statements of CBA and CBI were incorporated into the Prospectuses: (a) the audited financial statements of CBA as of December 31, 1972, and the unaudited financial statement as of March 31, 1973, were published in the original Prospectus dated August 17, 1973

(Ex. 21 at 50-55); (b) the audited financial statements of CBI as of November 4, 1975, were published in the Prospectus dated January 23, 1976 (Ex. 29 at 67-74); and (c) the audited financial statements of CBI as of December 31, 1975, and the unaudited financial statements as of October 31, 1976, were published in the Prospectus dated December 17, 1976. (Ex. 35 at 66-72.)

The Property is described as "other land and improvements" in the balance sheets of the financial statements incorporated into the Prospectuses. The auditor notes to these financial statements confirm that an appraisal of the Property had been conducted by a registered appraiser. (Ex. 35 at 68.) Initially, the balance sheets contained an aggregate value for the Property and all of the other accessory units owned by Dr. Klauber, such as the restaurant.[5] However, beginning with the Prospectus dated January 23, 1976, the appraised value for the Property was segregated from the other accessory units. (Ex. 29.) An appraised value of $468,562 is reflected for the Property as of November 4, 1975. (Ex. 29 at 71.)  The December 17, 1976 Prospectus reflects $453,832 as the appraised value of the Property as of October 31, 1976. (Ex. 35 at 69.)

F.    **The Compound Rent Escalation.**

The initial basic annual rental amount due under the Lease was $153,000.  (Ex. 15 at § 6.1.)  Section 6.2 of the Lease provides that the rent is subject to periodic increases tied to the Consumer Price Index (the "**CPI**"). (Ex. 15 at § 6.2.)  Specifically, every ten years beginning on January 1, 1983, the basic annual rental amount under the Lease is to be adjusted pursuant to a formula (the "**Rent Adjustment Formula**"). *Id.*  Under the Rent Adjustment Formula, after the initial increase in the base rent, each subsequent rent adjustment is compounded because the *previously adjusted rent* is multiplied by the ratio of (a) the CPI at the time of the subsequent

---

[5] The aggregate value is $716,057.  (Ex. 21 at 51.)

adjustment to (b) the CPI at December 1972 (not the CPI at the time of the previous adjustment). *Id*. Moreover, the Lease provides that once the basic annual rent is adjusted upwards, it can never be adjusted lower to account for decreases in the CPI. *Id*. The compound rent escalation provision contained in Section 6.2 of the Lease is contrary to the Prospectuses' descriptions of the rent escalation clause as calling for simple rather than compounding CPI adjustments. (Ex. 21 at 6, 10; 22 at 6, 10; and 35 at 36.)

A literal application of the Rent Adjustment Formula would generate current rents in excess of $1 million per year for the recreational facilities. The compounding effect of the Rent Adjustment Formula was never enforced, however, and the compounded rent was neither charged nor collected by the Lessors. Nevertheless, certain of the Lessors reserved their rights to assert that rent due under the Lease should be calculated under the literal terms of the Lease. In 1983, the basic annual rent was adjusted upward to $351,000; in 1993, it was adjusted to $510,000; and, in 2003, it was adjusted to $653,000, which is the current base rent claimed by the Lessors.

G.    **Prior Disputes Regarding The Lease.**

Since the inception of the Lease, there have been several lawsuits, numerous settlement agreements and various actions that have occurred between 1980 and the late 1990's indicating that some or all of the parties were unhappy about what had or could happen under the implementation of the Lease over time. Each of these disputes resulted in a temporary accommodation of one sort or another, but none of the disputes resulted in either a binding resolution properly agreed to by the Association and all of the Lessors or a duly recorded amendment in the public records of Sarasota County, Florida.

1.      1980 Letter.

In 1980, an attorney for the Association, John T. Blakely, wrote a letter raising the issue of unconscionability.  (Ex. 41.)  However, no lawsuit was ever filed making an affirmative claim as to recovery of monies paid pursuant to the Lease.

2.      1981 Amendment to the Lease.

Prior to the first adjustment of rent under the Lease, the Association executed – at a time when it was administratively dissolved (Ex. 54) – a purported amendment to the Lease (the "**1981 Amendment**") that replaced the Rent Adjustment Formula with an adjustment mechanism based on the fair market value of the Property and not tied to the CPI.  (Ex. 260.)  The 1981 Amendment was prepared to be signed by all of the record owners of the Property; but, the only Lessor to sign was CBI.[6]  *Id.*  Merrill and Field never signed the 1981 Amendment. (Ex. 260.)[7]

3.      The 1982 Indemnity Agreement.

A copy of the 1981 Amendment was recorded in the public records of Sarasota County, as an attachment to an Agreement executed by CBI, Investors and the dissolved Association, even though Investors no longer had an interest in the Lease (the "**Indemnity Agreement**"). (Ex. 68.)  The Indemnity Agreement recited that Merrill and Field had not approved or participated in the 1981 Amendment and provided that CBI and Investors would indemnify the Association against any liability for any basic annual rent in excess of the amount of rent calculated and charged in accordance with the 1981 Amendment.

---

[6] Although Investors also signed the 1981 Amendment, its interest in the Lease had already been transferred to the Manager in 1980 and the Manager did not sign the 1981 Amendment.  (Ex. 55.)
[7] The Association was administratively dissolved by the State of Florida from December 8, 1980 until January 19, 1990.  (Ex. 54 and 151.)

4.    The 1983 Lawsuit.

Starting in July of 1982 (Ex. 71) and continuing through November of 1983 (Ex. 93), the dissolved Association and the entities controlled by Dr. Klauber, CBI and Investors, attempted to resolve competing appraisals to determine the amount of the rent adjustment that was to take effect on January 1, 1983, according to the 1981 Amendment. Unable to resolve the rent adjustment, CBI and the Manager sued the Association on December 30, 1983, seeking a declaratory judgment "that the Lessors are entitled to an adjustment to basic annual rental referred to in the Recreation Lease based solely on fair market rental value as of January 1, 1983, together with attorney's fees and the cost of this action" (the "**1983 Lawsuit**"). (Ex. 94 at 3-4.) The dissolved Association defended the 1983 Lawsuit by denying the claims and demanding a declaratory judgment that the Lessor had breached the Lease and had failed to follow the proper procedure for appraisal as set forth in the 1981 Amendment. (Ex. 104.)

CBI and the Manager, as plaintiffs, in their complaint, and the dissolved Association, as defendant, in its answer, thereby framed the only matter which could be resolved among them – the interpretation of the 1981 Amendment.

5.    The 1984 Agreement and the Tenth Amendment to the Partnership Agreement.

Effective December 1, 1984, the dissolved Association entered into an agreement with the Partnership, the Manager, CBI (as successor to the interest in the Lease previously held by Investors) and Resorts (the "**1984 Agreement**"). (Ex. 115.)  The 1984 Agreement provides, among other things, that the Partnership shall pay and record as an expense of the Partnership all of the obligations of the Association, including the rental payments due under the Lease. *Id*. Co-Lessors Merrill and Field did not execute the 1984 Agreement.  *Id*.

The 1984 Agreement was not approved as an amendment to the Declaration and was not recorded.  The effectiveness of the 1984 Agreement was conditioned on a timely amendment of

the Partnership Agreement. (Ex. 115 at ¶ 14.)  The salient terms of the 1984 Agreement were approved by the limited partners and incorporated into the Tenth Amendment to Certificate and Agreement of Limited Partnership of Colony Beach & Tennis Club, Ltd. on April 3, 1986 (the "**Tenth Amendment**"). (Ex. 20.)

Pursuant to the 1984 Agreement, the Partnership disbursed to CBI and the Manager a partial payment of the disputed amount of rent due under the Lease. (Ex. 115 at ¶ 16.) On the date that the Tenth Amendment to the Partnership Agreement was approved, the dissolved Association agreed that the Partnership's payments under the Lease commencing January 1, 1983 would be $351,000 per year and that the 1981 Amendment would be revoked and rescinded effective as of January 1, 1983.  *Id.* at ¶ 17.  The dissolved Association also agreed that the Association would enter into a settlement agreement to dismiss the 1983 Lawsuit, with prejudice, within 10 days from the date of the approved amendment of the Partnership Agreement.  *Id.* at ¶ 18.

6.    The 1986 Settlement Agreement.

The dissolved Association executed a Settlement Agreement, dated March 28, 1986 (the "**1986 Settlement Agreement**"), to resolve the 1983 Lawsuit. (Ex. 123.) The 1986 Settlement Agreement provided, among other things, that (a) the 1983 Lawsuit would be voluntarily dismissed with prejudice, (b) the rental amount under Section 6.1 of the Lease would be $351,000 for the ten-year period beginning January 1, 1983, (c) the original terms of the Lease "are hereby ratified and confirmed," (d) all future rental adjustments under the Lease would be accomplished pursuant to the original non-amended provisions of Section 6.2 of the Lease, (e) the 1981 Amendment would, as of January 1, 1983, be terminated and of no further force and effect, and (f) each of the parties agreed to release each other from claims arising from the 1983 Lawsuit to the extent provided in an attached mutual release (the "**1986 Release**"). (Ex. 124.)

The 1986 Release was executed by the dissolved Association and provided that (a) CBI, the Manager and the Association would authorize and direct the dismissal of the 1983 Lawsuit with prejudice, and the Association authorized and directed the disbursement of all previously unpaid rent due under the Lease to CBI and the Manager using $351,000 as the basic annual rent from January 1, 1983, (b) "[e]ach of the parties and all those in privity with them release and forever discharge the other and all those in privity with them of and from any and all claims, demands, damages, actions, causes of action, or suits in equity, of whatever kind or nature, whether accruing now or in the future, or whether now known or unknown to the parties, for or because of any right, duty, or obligation set forth in the [1981 Amendment], and each of the parties agrees that its relationship with each other, with regard to the [Property] and the [Lease], shall be governed by the [Lease] as originally established and as interpreted in the [1986 Settlement Agreement]," (c) "each of the parties and all those in privity with them release and forever discharge the other and all those in privity with them of and from any and all claims . . . which is in any way directly and indirectly arising out of the [1983 Lawsuit]," (d) notwithstanding any other provision of the 1986 Release, "each of the parties agrees that nothing within this release is intended to alter the relationship and the obligation between the parties as established by the [Lease] as interpreted in the [1986 Settlement Agreement]," and (e) "each of the parties agrees that nothing within this release, or within the [1986 Settlement Agreement], is intended to extinguish the rights and obligations of the parties established by the [Lease] or for the [Lease] to be deemed a new agreement, either in whole or in part."

Although the 1986 Settlement Agreement and the 1986 Release purport to modify the Lease and terminate the 1981 Amendment, neither the 1986 Settlement Agreement, nor the 1986 Release, was executed by Merrill or Field or recorded in the public records of Sarasota County.

Also, the 1986 Settlement Agreement was executed on behalf of CBI and the Manager by Dr. Klauber, who also effectively controlled the administratively dissolved Association at that time. (Ex. 123 at 3.)

       7.     <u>The 1989 Lawsuit.</u>

In May 1989, Merrill sued Dr. Klauber and the individual trustees of the dissolved Association for damages arising out of Merrill's failure to receive 5% of the rental payments due under the Lease for the period from December 1, 1987 through April 30, 1990 (the "**1989 Lawsuit**"). (Ex. 132.)  The Association was defended in the 1989 Lawsuit by Dr. Klauber's attorneys. (Ex. 137.)  Dr. Klauber contended that Merrill's short-term loan of $75,000 to Dr. Klauber in 1974 was inadequate consideration for the transfer to Merrill of his 5% interest and Merrill had already received $150,000 by the time Dr. Klauber quit paying Merrill his share of the Lease rent in the late 1980's. (Ex. 164 at 13-15, 23.)

The 1989 Lawsuit was resolved via a joint stipulation of the parties (the "**1990 Stipulation**") which provided that Dr. Klauber would pay in excess of $60,000 in damages to Merrill. (Ex. 170.) When the 1990 Stipulation was executed, the Association had been reinstated as an entity by a filing made by Dr. Klauber, purporting to be president of the Association. (Ex. 151.)

On October 21, 1990, Merrill and the Association entered into an agreement to reinstate the Lease as originally executed (the "**Reinstatement Agreement**"). (Ex. 308.) The Reinstatement Agreement purported to (a) acknowledge that the Association had made all payments due to Merrill and was not in default of any obligation under the Lease, (b) provide that the Lease "is valid and binding upon each of the parties hereto in accordance with its original terms as to Merrill's 5% undivided interest thereunder, and is hereby ratified and confirmed in its entirety," (c) require future payments due from the Association to Merrill to be

paid directly to Merrill, and (d) assert that the Association had authority to enter into the Reinstatement Agreement "by virtue of its status as the Condominium Association for the Colony Beach & Tennis Club pursuant to Chapter 718, Florida Statutes." *Id.*

The Reinstatement Agreement was not executed by any of the other Lessors.   Moreover, the Reinstatement Agreement was not executed by Merrill with the formalities of a deed because Merrill's signature was not notarized. Nor was the Reinstatement Agreement recorded in the official records of Sarasota County.

8.     The 1994 Settlement Agreement.

A new dispute arose as to the adjusted basic annual rent due under the Lease for the ten-year period beginning on January 1, 1993.  To resolve this dispute, the Association (as lessee) and CBI and the Manager (as 80% lessors) entered into a Settlement Agreement as of October 6, 1994 (the "**1994 Settlement Agreement**"), which purported to set the adjusted basic annual rent under the Lease at $510,000 for the ten-year period beginning on January 1, 1993. (Ex. 214.) Neither Merrill nor Field executed the 1994 Settlement Agreement. *Id.*  The record reflects that both Merrill and Field expressly repudiated the 1994 Agreement as not having been negotiated with them.  (Ex. 201 and 204.)

The 1994 Settlement Agreement provided that: (a) the parties disagreed on the interpretation of Paragraph 6.2 of the Lease and on the enforceability and validity of the rent escalation clause in the Lease; (b) the parties agreed not to challenge the validity or enforceability of the rent escalation clause through December 31, 2002; (c) no provision of the 1994 Settlement Agreement shall preclude or prejudice the Association from challenging the validity or enforceability of the rent escalation clause after December 31, 2002; (d) the Association reserves all rights, and that no term of the 1994 Settlement Agreement shall be raised as a waiver or an estoppel of the Association's rights; (e) the annual basic rent due under

15

the Lease beginning January 1, 2003, would be calculated without the compound escalation that exists in the Lease; and (f) the 1994 Settlement Agreement does not affect the Partnership Agreement, as amended, or the 1984 Agreement. (Ex. 214.)

9.    Present Dispute.

After the Unit Owners rejected proposals by Dr. Klauber to rebuild The Colony in 2005 and in 2006, the Partnership filed a suit on or about May 1, 2007 in state court against the Association seeking declaratory and other relief (the "**Partnership Action**").  The Association filed a third-party action against Resorts and the Lessors in the Partnership Action challenging the validity of the Lease.  However, the Association voluntarily dropped the Lessors from the Partnership Action and, on or about February 19, 2008, commenced a separate action against the Lessors seeking, among other things, declaratory judgment that the Lease is unconscionable as a matter of law and declaratory relief that the rent escalation clause in the Lease is void and unenforceable.

On or about September 10, 2008, the Partnership advised the Debtor that, as of October 1, 2008, the Partnership would no longer pay the rent due under the Lease. (Ex. 228.)  Instead, the Lessors sought recovery from the Association and the Unit Owners, who had no right to use or control the Property.  (Ex. 230, 235 and 238.)  In the meantime, however, the Lessors had orally agreed to permit the guests of the Hotel to use the Property without charge. (Ex. 242 at 165:13-22.)

## CONCLUSIONS OF LAW

The Court concludes that the Lease is unconscionable and unenforceable and, therefore, disallows the Claims asserted by the Lessors against the Association in their entirety. Specifically, the Court concludes that the Lease is presumptively unconscionable pursuant to Section 718.122 of the Florida Statutes and that the Lessors failed to adequately rebut the

presumption of unconscionability.  In addition, the Court concludes that the Lease is both procedurally and substantively unconscionable under Florida common law.  The Court is only making its ruling on the unconscionability of the Lease in relation to the disallowance of the Lessors' Claims for lease rejection damages against the Association and the denial of the motion for payment of post-petition rent by Merrill and Field.  The Court is not ruling on the liabilities or defenses of the individual Unit Owners.

As to the Association's argument that the rent escalation clause of the Lease is void and unenforceable as against public policy under Section 718.4015 of the Florida Statutes, the Court concludes that the application of this statute to the Lease is prohibited by the statute's own terms inasmuch as the Lease was entered into, and the Association was a party thereto, prior to June 4, 1975.  Moreover, the Court concludes that the Association does not have standing to raise, and the Court declines to determine whether any Unit Owner who may have purchased a unit after June 4, 1975, can assert that a novation was made that would make the provision of Section 718.4015 applicable to them.

Finally, the Court concludes that the Association was not barred from asserting the unconscionability of the Lease as a defense to the Lessors' Claims in these proceedings by virtue of either the statute of limitations, the doctrines of waiver or laches, *res judicata* or collateral estoppel.

A.    **The Lease Is Unenforceable Under Florida Law.**

Unconscionability of the Lease must be considered in the unusual context of The Colony. The cases that apply unconscionability to recreational facilities leases involve associations whose members live in a residential condominium, occupy their units and use the recreational facilities as much as they desire.  In this case, however, the Association and its members are expressly precluded from living in their units or using the Property, which are instead exclusively reserved

for the guests of the Hotel.  Dr. Klauber was the original developer, the person responsible for excluding the Property from the Declaration and prescribing the terms of the Lease, the General Partner and sole operator of the Hotel, and the holder of an 80% interest in the Lease.  Lawyers for the Association also worked for Dr. Klauber; Dr. Klauber's affiliate managed the Association; Dr. Klauber signed documents on behalf of the Association, as its President; Dr. Klauber and Mr. Penner created the original deal.  All of that satisfies the test for procedural unconscionability.  In addition, the Declaration of Condominium reflects that it was prepared by Mr. Merrill, and under the Articles of Incorporation of the Association, Dr. Klauber, Mr. Merrill and Mr. Penner, as its First Board of Directors, controlled the Association until December 31, 1977.

       1.     <u>The Lease Is Unconscionable.</u>

"[U]nder well settled principles of Florida law, 'an unconscionable contract or an unconscionable term therein will not be enforced by a court of equity.'"  *Beeman v. Island Breakers, A Condo., Inc*., 577 So. 2d 1341, 1345 (Fla. 3d DCA), *corrected by*, 591 So. 2d 1031 (Fla. 3d DCA), *rev. denied*, 591 So. 2d 180 (Fla. 1991) (emphasis omitted and citing *Steinhardt v. Rudolph*, 422 So. 2d 884, 889 (Fla. 3d DCA 1982)).  Florida law recognizes a claim that a recreational facilities lease is unconscionable under common law.  *See Beeman*, 577 So. 2d at 1345; *Steinhardt*, 422 So. 2d at 889; *see also Avila S. Condo. Ass'n v. Kappa Corp.*, 347 So. 2d 599, 605 (Fla. 1977).  A claim for unconscionability under common law may be made with respect to any recreational lease, regardless of when it was executed.  *See Penthouse N. Ass'n, Inc. v. Lombardi*, 461 So. 2d 1350, 1351 (Fla. 1984).  In addition, Florida law provides that certain condominium recreational leases, such as the Lease, are presumptively unconscionable. *See* Fla. Stat. § 718.122 (2008).

a.    *The Lease Is Presumptively Unconscionable Under Fla. Stat. § 718.122.*

Section 718.122(1) provides that a lease pertaining to use by condominium unit owners of recreational facilities is presumptively unconscionable, irrespective of the date when such lease was executed, if certain enumerated factors are present in the lease. All parties conceded that the Lease satisfies all of the enumerated factors under Section 718.122(1) other than subparagraph (g), which gives rise to a presumption of unconscionability if the rent exceeds 25% of the value of the property during the first tax year after sales of condominium units commenced. The evidence establishes that the Lease satisfies each and every one of the factors enumerated in Section 718.122(1) of the Florida Statutes, including subparagraph (g).

As evidence in support of the presumption of unconscionability, the Association introduced the Prospectuses that contained audited and unaudited financial statements reflecting the value of the Property in the first tax year after the initial sale of units at The Colony. In the financial statements included in the Prospectuses, the Property was shown on the balance sheets in the line-item "Other Land and Improvements," which were noted to be based upon an appraisal. (Ex. 35 at 68.) The Prospectuses contained a statement that the annual rate of return to the Lessors under the Lease would be 17.6% of their cost to obtain the Property. (Ex. 29 at 10, 37 at 9, 38 at 9.) This statement could suggest an initial cost of the Property of approximately $870,000.[8] However, there is no evidence in the record that the Property was ever reflected on the books of the developers of The Colony or the Lessors at $870,000. Conversely, the Prospectuses do reflect an approximate value of $470,000 for the Property.

These records support the conclusion that the Property had a value at the time of no greater than $470,000. The Property is shown in the balance sheet of the January 23, 1976 Prospectus as having a value of $468,567 (Ex. 35 at 68) and, in a subsequent Prospectus, the

---

[8] $153,000 divided by 17.6% equals $869,318.18.

value of the Property is listed on the balance sheet at $453,831. (Ex. 37 at 72.) By finding that the Property had a value no greater than $470,000 during the first tax year after the first sale of units at The Colony, the Court concludes that the initial annual base rent of $153,000 was approximately 32.5% of the Property's value in the first year, thus exceeding the 25% of value requirement of Section 718.122(1)(g).

The Association also presented the testimony of Mr. Gerald Russell as to the value of the Property. However, Mr. Russell's testimony focused on the current value of the Property and he presumed that the Property was vacant for purposes of his appraisal. (5/18/09 Tr. 110:6-7.) With regard to the applicability of the statute, which deals with the value of the leased premises when condominium units were first sold, Mr. Russell's testimony was not helpful to the Court.

The Lessors presented the opinion testimony of Dr. Henry Fishkind ("**Dr. Fishkind**") to rebut the presumption of unconscionability of the Lease. Dr. Fishkind's testimony was that the rent charged under the Lease is somewhere in the middle of other rents charged for other recreational facilities leases. (5/19/09 Tr. 30:1-6.) In forming his opinion, that the rent was comparable, Dr. Fishkind analyzed the Lease in terms of "equivalent recreational units." (5/19/09 Tr. 28:1-7.) While thoughtful and creative, the concept of "equivalent recreational units" was strictly subjective and little more than analytical fiction. Dr. Fishkind's equivalent recreational unit analysis is not an accepted scientific methodology, is not set forth in any academic literature or textbooks, and there is no indication that anyone else in the field of economics or appraisals uses such a methodology. (5/19/09 Tr. 56:10-15.) Dr. Fishkind testified that the concept of "equivalent *residential* unit" was employed in bond validation proceedings. Dr. Fishkind was unable to translate that method to the novel "equivalent recreational unit" he employed in the instant case.

Rule 702 of the Federal Rules of Evidence governs the use of Dr. Fishkind's opinion testimony. So does *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In that case, the Supreme Court promulgated certain non-exclusive factors for assessing the reliability of scientific expert testimony, including: (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards or controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Dr. Fishkind's "equivalent recreational unit" approach was not based on objective scientific facts and data, nor were his conclusions the product of reliable scientific principles and methods. (5/19/09 Tr. 54:17-63:22.) Indeed, Dr. Fishkind testified that the "equivalent recreational unit" approach was simply borrowed from his prior work in the context of bond validations. (5/19/09 Tr. 54:17-55:23.)

Dr. Fishkind also testified that the concepts involved in the "equivalent recreational unit" analysis were subjective and not set forth in any published standards. (5/19/09 Tr. 57:19-59:18; 56:10-18.) Dr. Fishkind's subjective "equivalent recreational unit" approach cannot serve as the basis for an expert opinion that the Lease is not unconscionable. The Court finds Dr. Fishkind's testimony to be unpersuasive and rejects his opinions thereon.

The Lessors did not introduce into evidence any appraisal or admissible opinion of value of the Property during the first tax year after sales of condominium units commenced that contradicted the value of approximately $470,000 reflected in the financial statements included

in the Prospectuses. Accordingly, the Lessors failed to establish a sufficient evidentiary basis to rebut the statutory presumption of unconscionability and, therefore, the Lease must be declared unconscionable and unenforceable.

        b.        <u>Notwithstanding the Statutory Presumption, the Lease Is Unconscionable Under Florida Common Law.</u>

The Court also concludes that the Lease is unconscionable under Florida common law. Regarding unconscionability, the Florida Supreme Court has held "where it is perfectly plain to the court that one party has overreached the other and has gained an unjust and undeserved advantage which it would be inequitable to permit him to enforce . . . a court of equity will not hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness." *Peacock Hotel, Inc. v. Shipman*, 138 So. 44, 46 (Fla. 1933); s*ee also Point E. One Condo. Corp. v. Point E. Developers, Inc.*, 348 So. 2d 32 (Fla. 3d DCA 1977); *Steinhardt*, 422 So. 2d 884. "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." *Id.* at 889 (quoting Restatement (Second) of Contracts § 208 (1979)); *see also* Fla. Stat. § 672.302(1) (2008). The Florida Supreme Court has also held that "[t]ransactions in which a corporate fiduciary derives personal profit, either in dealing with the corporation or its property, or in matters of corporate interest, are subject to the closest examination . . . ." *Avila S. Condo. Ass'n*, 347 So. 2d at 606.

Under well-established Florida law, a contract may be voided where it can be shown to be both procedurally and substantively unconscionable. *See Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999). Specifically, "[t]he procedural component of unconscionability relates to the manner in which the contract was entered and it involves consideration of such

issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms." *Id*. Two indicators of procedural unconscionability are "the absence of any meaningful choice on the part of the consumer" and that the important terms of the agreement are "hidden in a maze of fine print." *Id*. at 574-75 (internal citations omitted); *see also Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 265 (Fla. 2d DCA 2004). In contrast, substantive unconscionability looks to the terms of the agreement itself. *Powertel*, 743 So. 2d at 574.[9]

Florida courts have expressly applied these principles of unconscionability to recreational facilities leases. *See Steinhardt v. Rudolph*, 422 So. 2d 884 (Fla. 3d DCA 1982); *Kohl v. Bay Colony Club Condo., Inc.*, 398 So. 2d 865 (Fla. 4th DCA 1981).[10] Specifically, in *Steinhardt*, the court found procedural unconscionability where the developer engaged in self-dealing and the individual condominium owners had "no real meaningful choice in accepting the double escalation of rent clause or, indeed, any other clause contained in the subject ground lease." *Steinhardt*, 422 So. 2d at 892. The court also found substantive unconscionability in the actual terms of the lease, which imposed upon the individual owners the duty of paying the real estate taxes, insurance costs, and all maintenance expenses with respect to the leased premises and imposed no duty on the developer to do anything for nearly a century but accept the rents. *Id* at 893. The court observed that these requirements were "powerful factors of substantive unconscionability . . . recognized as indicia of common law unconscionability when applied to

---

[9] Some Florida courts use a balancing approach to substantive and procedural unconscionability, and "if the contract is substantively unconscionable to a great degree, and some quantum of procedural unconscionability exists, the contract is unenforceable." *Orkin* at 265 (citing *Romano ex rel. Romano v. Manor Care, Inc.*, 861 So. 2d 59, 60-63 (Fla. 4th DCA 2003)) and *Kohl v. Bay Colony Club Condo., Inc.*, 398 So. 2d 865, 868 (Fla. 4th DCA 1981).

[10] *See also Cole v. Angora Enters., Inc.*, 370 So. 2d 1227 (Fla. 4th DCA 1979); *Burleigh House Condo., Inc. v. Buchwald*, 368 So. 2d 1316, 1317 (Fla. 3d DCA), *cert. denied*, 379 So. 2d 203 (Fla. 1979), *overruled on other grounds by Penthouse N. Ass'n*, 461 So. 2d 1351-52 (Fla. 1984); *Avila S. Condo. Ass'n v. Kappa Corp.*, 347 So. 2d 599, 605 (Fla. 1977); *Point E. One Condo. Corp. v. Point E. Devs., Inc.*, 348 So. 2d 32, 36 (Fla. 3d DCA 1977).

other related long-term condominium leases." *Id.* (citing Fla. Stat. § 718.122(1)(b)-(d) (1981)).

The *Steinhardt* court's conclusion that the lease was unconscionable was bolstered by the fact that the Florida legislature had deemed rent escalation clauses void as against public policy, and held that "[t]his gives added weight, we think, to our conclusion that the rent escalation clause should be, at least, one indicia of substantive unconscionability under Florida contracts law when applied to any condominium lease . . . ." *Id.* The court also found offensive the notion that the developer was "totally protected against non-payment of rent at the expense of the unit owners' interests" because the lease provided that a lien could be imposed on the individual units for any unpaid rent under the lease. *Id.* at 894. Likewise, the Fourth District Court of Appeal stated as follows in concluding that a condominium association had sufficiently pled a cause of action for unconscionability of a recreational facilities lease:

> where [a recreational facilities] lease requires payment of taxes and expenses in perpetuity and such payment is exacted from unit owners who may never avail themselves of the opportunity to utilize the rented facilities then the document is at least suspect. We duly note that the original lessor-developer obviously incurred expense in purchasing the land and constructing the facilities. All subsequent expense is borne by the lessees. *Once the developer recoups his investment and a reasonable profit the burden should be on the developer to establish fairness and reasonableness . . . .*

*Kohl*, 398 So. 2d at 869 (emphasis added).

Like the leases in *Steinhardt* and *Kohl*, the Lease is unconscionable under Florida common law. The Lease is procedurally unconscionable because it is clear from the record that Dr. Klauber, through CBA, dictated the terms of the Lease in 1973 as both the lessor and the developer in control of the Association. Dr. Klauber's negotiation of the Lease was an act of self-dealing: neither the Association, nor the individual Unit Owners had any meaningful choice regarding the terms of the Lease. The Court finds that the Association was controlled by Dr. Klauber or one of his affiliates until May 2007, either by the Association's management or by

24

Dr. Klauber or his affiliates during the period when the Association was administratively dissolved.

It is also clear that the terms of the Lease are substantively unconscionable. The Lessors are essentially entitled to receive above-market rent for 99 years with absolutely no responsibilities. Indeed, the Lease requires the Association to bear the cost of maintenance, insurance, and taxes for the leased premises. (Ex. 15 at §§ 5.2(c), 7.1, 7.2.) Additionally, the Lessors are protected against non-payment of rent and, pursuant to the terms established by Dr. Klauber, the Lessors can even purportedly place liens upon the individual units of Unit Owners for non-payment of rent. (Ex. 15 at § 9.3.) Most egregiously, the Lease provides that the Lessors can never be in breach of the Lease. (Ex. 15 at § 5.3.)[11]

The Lessors are currently claiming damages based upon the current adjusted annual base rent of $653,000 per year, about $74,000 in taxes per year, and about $13,000 of insurance per year, which equals an aggregate amount of damages of approximately $740,000 per year. Divided amongst the 237 Unit Owners, this results in an obligation of $3,122 per Unit Owner per year for the Lease. This is not a residential condominium where the unit owners actually live in their units 365 days of the year. Rather, for no more than thirty days of each year, the Unit Owners are guests of the Hotel along with other members of the public. Given that the Unit Owners are restricted to at most thirty days' use of The Colony per year, that is equal to paying approximately $104 per day for each Unit Owner's use of the recreational facilities at The Colony. The Court concludes that $104 per day is a grossly unreasonable amount for Unit Owners to pay for the amenities provided under the Lease.

_____

[11] Section 5.3 of the Lease provides, in pertinent part, that "[n]o act of commission or omission by the Lessor shall ever by construed or considered: (a) as a breach by the Lessor of any or its promises and covenants . . . ; (b) as an actual, implied or constructive failure by the Lessor to deliver possession of the demised premises to the Lessee; or (c) as an actual, implied or constructive eviction of the Lessee from the demised premises by the Lessor . . . ."

The Lessors assert that any substantive unconscionability of the Lease's terms is cured by the disclosure of the terms of the Lease. However, the numerous disputes over the years regarding the terms and provisions of the Lease lead the Court to conclude that there was never an adequate disclosure of the terms of the Lease. Certainly, the subtleties of the rent escalation clause were never adequately disclosed in the Prospectuses and sales literature.

Furthermore, under the Lease, the Lessors are entitled to compounded rent increases tied to the CPI, which rent can never decrease. (Ex. 15 at § 6.2.) Since the initial investment in the Property, the Lessors have received approximately $13 million in rent under the Lease on property valued at approximately $470,000 at the time of the initial sale of units at The Colony. There can be no doubt that the Lessors have recovered far in excess of the initial investment plus a reasonable profit. As such, in accordance with the reasoning in *Kohl*, the burden shifted to the Lessors to establish the fairness and reasonableness of the Lease. *See Kohl*, 398 So. 2d at 869. The Lessors, however, failed to carry their burden and establish the reasonableness of the Lease.

As such, given the overwhelming procedural and substantive unconscionability of the Lease, the Court concludes that the Lessors have "overreached [and] gained an unjust and undeserved advantage which it would be inequitable to permit [them] to enforce . . . even though the victimized parties [may] owe their predicament largely to their own stupidity and carelessness." *See Peacock Hotel*, 138 So. at 46.

**B.**     **The Association Does Not Have Standing to Assert the Unenforceability of the Escalation Clause Under Fla. Stat. § 718.4015.**

Section 718.4015 of the Florida Statutes declares that certain rent escalation clauses in condominium leases are void. However, the Florida Supreme Court has held that Section 718.4015 of the Florida Statutes does not apply to recreational facilities leases that were entered into prior to the statute's enactment on June 4, 1975. *See Ass'n of Golden Glades Condo. Club,*

*Inc. v. Sec. Mgmt. Corp.*, 557 So. 2d 1350 (Fla. 1990); *Maison Grande Condo. Ass'n, Inc. v. Dorten, Inc.*, 600 So. 2d 463 (Fla. 1992).

The Association has asserted that, under Florida law, a novation occurred each time the developer sold a unit after June 4, 1975 and the new Unit Owner became a party to the Lease. *See Jakobi v. Kings Creek Village Townhouse Ass'n, Inc.*, 665 So. 2d 325 (Fla. 3d DCA 1995.) The Association argues that, because a novation was effected when each unit was transferred for the first time to a Unit Owner, the Lease was subject to applicable law at the time of each sale of a unit. *See Jakobi,*, 665 So. 2d at 327 ("A statute in effect at the time of a novation will determine the rights and obligations of the parties to the novation even if the statute was not in effect at the inception of the original contract.")

As to the Association itself, as distinguished from each individual Unit Owner, the Court finds that the Association has been a party to the Lease from the inception of the Lease in 1973. (Ex. 15.)  The Court determines that the argument that a subsequent sale of a unit would result in a novation that would inure to the benefit of the Association would negate the Florida Supreme Court's holding in *Maison Grande* and *Golden Glades*.  As such, the Court concludes that there was no novation of the Lease as to the Association and the Association cannot benefit from any unenforceability of the rent escalation clause in the Lease under Section 718.4015 of the Florida Statutes.  In addition, to the extent that a Unit Owner's purchase of a unit after June 4, 1975 could result in a novation of the Lease, the Court concludes that the Association does not have standing to raise the novation issues on behalf of any such Unit Owner in the context of these proceedings.  Therefore, the Court rejects the application of the novation theory in dealing with the claims against the Association and makes no finding with respect to the ability of individual Unit Owners to assert a novation because that issue is not before the Court.

**C.** **The Association Has Not Released or Waived Its Defenses to the Enforcement of the Lease and the Association Is Not Precluded From Raising Such Defenses.**

    1.    The Association Has Not Released or Waived Defenses to the Lessors' Enforcement of the Lease.

The Court concludes that the Association has never released or waived its right to defend itself against the Lessors' enforcement of the Lease.

    *a.*    *The Association Has Not Released the Lessors From Claims that the Lease is Unconscionable.*

The Lessors have urged that the 1986 Release bars the Association's unconscionability defense. "The validity and effect of a settlement and release are governed by contract law." *Travelers Ins. Co. v. Horton,* 366 So. 2d 1204, 1205 (Fla. 3d DCA 1979). Where the language in a release is "clear and unambiguous, the contract is the best evidence of the parties' intent and the . . . court should look to the document's plain meaning when interpreting it." *Herpich v. Estate of Herpich,* 994 So. 2d 1195, 1197 (Fla. 5th DCA 2008). If the language in the release is "susceptible to more than one meaning, the court may resort to the rules of construction and [should] rely on extrinsic evidence to interpret it." *Id.*

The Court finds that both the plain language of the 1986 Release and the circumstances under which it was entered into show that the parties did not intend for the 1986 Release to release the Association's defenses of unconscionability. The release provides that CBI, the Manager and the Association:

> release and forever discharge the other and all those in privity with them of and from any and all claims, demands, damages, actions, causes of action, or suits in equity, of whatever kind or nature, whether accruing now or in the future, or whether now known or unknown to the parties, *for or because of any right, duty or obligation set forth in the Amendment to the Recreation Lease . . .* or because of any matter or thing done or omitted, or suffered by either of the parties prior to and including the date hereof *which is in any way directly and indirectly arising out of the Litigation . . . .* In addition, each of the parties agrees that nothing within this release, or within the Agreement, is intended to extinguish the rights and obligations of the parties established by the Recreation Lease . . . .

(Ex. 124) (emphasis added).  Thus, the Association was only releasing CBI and the Manager as to those specific issues raised by the ineffective 1981 Amendment and the 1983 Lawsuit (the term "Litigation" is defined in the 1986 Release as the 1983 Lawsuit), in which CBI and the Manager sought declaratory relief as to the calculation of the rent adjustment under the 1981 Amendment.  (Ex. 124.)  The narrow scope of the 1986 Release is consistent with the narrow scope of the 1983 Lawsuit that the release was intended to resolve.

The complaint filed by CBI and the Manager in the 1983 Lawsuit stated that the purpose of the action was to determine "Plaintiffs' rights under an Amendment to the Recreational Facilities Lease."  (Ex. 94 at ¶ 1.)  At a hearing held in mid-1984, the attorney for the Association and the attorney for CBI and the Manager both agreed that the scope of that litigation was limited to the 1981 Amendment.[12]  Therefore, the Court concludes that it was the intent of the parties to limit the 1986 Release to address only those issues arising out of the ineffective 1981 Amendment.  *See Mazzoni Farms, Inc. v. E.I DuPonte de Nemours and Co.,* 761 So. 2d 306 (Fla. 2000) (holding that qualifying language in a release must be given significance and limits the breadth of the release).

In subsequent litigation and agreements between the Association and the Lessors, neither party considered that the 1986 Release would preclude the Association's defense of unconscionability.  Consistent with the language of the 1986 Release, the 1994 Settlement Agreement expressly states that the Association has a right to challenge the unconscionability of the Lease after December 31, 2002.  (Ex. 214.)

---

[12] CBI and the Manager's counsel stated that the suit deals "with an interpretation of an amendment to a condominium lease." (Ex. 114 at 3:1-2.)  Likewise, the Association's counsel stated that "the subject matter of the litigation is what does the amendment mean." (Ex. 114 at 4:1-2.)

b.      *The Association Has Never Waived the Defense of Unconscionability.*

Waiver is defined as one party's intentional abandonment of a known privilege or right. *See Destin Sav. Bank v. Summerhouse of FWB, Inc.,* 579 So. 2d 232, 235 (Fla. 1st DCA 1991). To establish waiver, the party asserting its existence must prove "(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish that right, privilege, advantage or benefit." *Id.* The party arguing that waiver has occurred must present a "clear case" that these elements have been met. *See Air Prod. & Chems., Inc. v. La. Land & Exploration Co.,* 867 F.2d 1376, 1379 (11th Cir. 1989) (applying Florida law). "The crux of the waiver doctrine rests upon conduct demonstrating an intent to relinquish a known right." *Ferry-Morse Seed Co. v. Hitchcock,* 426 So. 2d 958, 962 (Fla. 1983).

As discussed above, the 1983 Lawsuit was filed by CBI and the Manager seeking only limited declaratory relief as to the 1981 Amendment. The 1986 Settlement Agreement, which resolved the 1983 Lawsuit, does not evidence an intent of the parties to release any defense of unconscionability that the Association may have had at that time. Moreover, the 1986 Settlement Agreement was not a waiver or release by the Association because the Association was not truly independently operated until the Association's management company was changed in May 2007 and, effectively, Dr. Klauber controlled both sides of the agreement. The Reinstatement Agreement (1990) was not a waiver of any unconscionability defenses by the Association because it resolved technical issues that were concluded without raising or dealing with the unconscionability argument.

Similarly, the Association was not required to raise unconscionability as a defense to Merrill's suit to collect unpaid rent in 1989. Essentially, the 1989 Lawsuit was between Dr. Klauber and Merrill, due to Dr. Klauber's failure to pay 5% of the rent to Merrill, and the

Association's directors were only nominal defendants.[13]  Significantly, the Association was administratively dissolved at the time of the 1989 Lawsuit and was not represented by independent counsel. (Ex. 137)  Moreover, for at least the first eight months of the litigation, Dr. Klauber failed to inform the Association that the litigation had even been filed.  (Ex. 164 at 26:15 – 27:19.)  During the remainder of the Merrill litigation, the Association was represented by an attorney that was chosen and paid by Dr. Klauber.  (Ex. 164 at 28:17 – 28:21.) Accordingly, the Court concludes that the Association's failure to raise unconscionability in the 1989 Lawsuit does not constitute an intentional waiver of the Association's defense of unconscionability.[14]

> 2.    The Association's Defenses Are Not Barred By Either *Res Judicata* or Collateral Estoppel.

The party asserting *res judicata* must show that the previous litigation involved identity of (1) the thing sued for, (2) the cause of action, (3) the persons and parties, and (4) quality of capacity of the person for or against whom the claim is made. *See Campbell v. State,* 906 So. 2d 293, 295 (Fla. 2d DCA 2004) ("The party claiming the benefit of res judicata has the burden of establishing with sufficient certainty . . . that the matter was formerly adjudicated.").  "The determining factor in deciding whether the causes of action are the same is whether the facts and evidence necessary to maintain the suit are the same in both actions." *Inter-Active Servs., Inc. v. Heathrow Master Ass'n,* 809 So. 2d 900, 902 (Fla. 5th DCA 2002).  Moreover, when a voluntary dismissal arises from the stipulation of the parties, the stipulation "should be interpreted

---

[13] Merrill did not sue the Association directly because the Association had been administratively dissolved for nearly a decade. (Ex. 143.)  Even when the Association was reinstated, it was controlled by Dr. Klauber, as evidenced by his signature as "president" on the reinstatement form filed with the Secretary of State.  (Ex. 151.)

[14] However, even if the 1986 Settlement Agreement and the 1990 Stipulation were deemed an intentional waiver of the unconscionability defense, the Court concludes that neither agreement was binding upon the Association inasmuch as they failed to meet the requirements of an amendment to the Lease under either the terms of the Lease or the Declaration.  The doctrine of waiver does not generally apply to agreements that do not comply with applicable law. *See Montsdoca v. Highlands Bank & Trust Co.*, 95 So. 666, 668 (Fla. 1923).

according to its express terms, rather than according to traditional principles of *res judicata.*" *Norfolk S. Corp. v. Chevron, U.S.A., Inc.,* 371 F.3d 1285, 1291 (11th Cir. 2004). Finally, the Florida Supreme Court has recognized that the doctrine of *res judicata* "will not be invoked where it will work an injustice." *deCancino v. E. Airlines, Inc.,* 283 So. 2d 97, 98 (Fla. 1973).

Collateral estoppel "prevents identical parties from relitigating the same issues that have already been decided." *Dep't of Health & Rehab. Servs. v. B.J.M.,* 656 So. 2d 906 (Fla. 1995); *see also State v. McBride,* 848 So. 2d 287, 290 (Fla. 2003). Collateral estoppel is limited to issues actually litigated in a prior proceeding. *See B.J.M.,* 656 So. 2d at 906.

Here, all of the prior lawsuits were dismissed pursuant to written stipulations that resolved certain limited issues and expressly reserved the parties' rights as to other issues not raised in the litigation. (Ex. 123 and 171.) Indeed, unconscionability has never been litigated in any of the previous lawsuits and, in fact, the defense is expressly reserved to the Association in the 1994 Settlement Agreement. (Ex. 214 at ¶ 5.) The 1983 Lawsuit was not *res judicata* because the issue of unconscionability was not essential to the outcome of the lawsuit which dealt with whether the fair market rent formula under the 1981 Amendment was binding on the parties. Likewise, the 1989 Lawsuit only raised issues as to certain loans made to Dr. Klauber and whether they were paid back or whether they were consideration for the 5% interest in the Lease granted to Merrill. There has never been mutuality of parties because the Association was a dissolved entity and not all of the Lessors were parties in the lawsuits. Therefore, the Court concludes that neither *res judicata* nor collateral estoppel bars the Association from raising unconscionability as a defense to the Lessors' Claims.

The argument has been made that Merrill and Field were in privity with CBI and the Manager and, thus, any agreement or litigation with some of the Lessors binds all of them. This

argument is not supported by the conduct of the parties. The terms of the Lease and the requirements of the Declaration prohibit any change to the obligations under the Lease unless the Lessors and record owners of the fee simple title to the Property join in the execution of the amendment. Merrill and Field elected not to execute the various settlement agreements; Merrill sued Dr. Klauber in 1989. While it may be true that, if the rent adjustment formula was determined to be enforceable in an action brought by CBI and the Manager, it could have been binding on Merrill and Field, the inverse of that is not necessarily true. If it was determined that the Rent Adjustment Formula was not enforceable in a situation where CBI and the Manager were the Plaintiffs or parties to a settlement agreement, that would not necessarily be binding on the other Lessors. Therefore, the Court rejects the privity argument in every instance where all the Lessors were not signatories to the settlement agreement or parties to the lawsuit. Accordingly, the Court concludes that the Association's defense of unconscionability is not precluded by either *res judicata* or collateral estoppel.

       3.      <u>The Association's Defenses Are Not Barred By Statute of Limitations or Laches.</u>

          a.      *<u>The Statute of Limitations Does Not Bar the Association's Defense of Unconscionability of the Lease.</u>*

The Court concludes that, under Florida law, affirmative claims that would otherwise be barred by a statute of limitations may still be asserted as a defense. *See Allie v. Ionata*, 503 So. 2d 1237, 1240-41 (Fla. 1987); *see also In re Smith*, 737 F.2d 1549, 1554 (11th Cir. 1984) (recognizing that "the statute of limitation aimed at precluding stale litigation will not cut off consideration of a defense to an action"). Florida courts have applied *Allie* to hold that a counterclaim for recoupment "is not barred by the statute of limitations that otherwise might have applied had it been brought as an independent claim." *Maynard v. Household Fin. Corp. III*, 861 So. 2d 1204, 1207 (Fla. 2d DCA 2003). In *Maynard*, the court held that a defendant

could assert claims of fraud in the inducement and breach of contract as defenses notwithstanding that the statute of limitations had run on bringing such claims affirmatively.

Likewise, the United States Supreme Court has held that the statute of limitations does not bar a party from asserting a defense that would otherwise be time barred if brought affirmatively. *Reiter v. Cooper,* 507 U.S. 258, 263-65 (1993).[15] Such recoupment defenses may be asserted by debtors as defenses to claims made against them in bankruptcy cases. *See In re Affiliated of Fla., Inc.,* 258 B.R. 495, 501 (Bankr. M.D. Fla. 2000) (recognizing that recoupment is "the satisfaction of an obligation by crediting against it a reciprocal obligation arising from the same transaction"); *In re Izaguirre,* 166 B.R. 484, 491 (Bankr. N.D. Ga. 1994) ("Courts have often permitted the use of recoupment in bankruptcy cases.").   The Association's objections to the Lessors' Claims for rejection damages are substantively asserted as a defense.  Moreover, the Association is not seeking to apply Section 718.122 retroactively as an affirmative claim against the Lessors, but only as a defense to the Lessors' asserted Claims.  As such, the Court concludes that the statute of limitations is not a bar to the Association asserting defenses to the Claims asserted by the Lessors.

> b.    *The Doctrine of Laches Does Not Bar the Association's Defense of Unconscionability of the Lease.*

"Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party." *Ticktin v. Kearin,* 807 So. 2d 659, 663 (Fla. 3d DCA 2001).  The party asserting laches must prove prejudice such that the moving party "has sat on its rights," *Miami-Dade County v. Fernandez,* 905 So. 2d 213, 216 (Fla. 3d DCA 2005), and that the "delay was not excusable." *In re S. Motor Co. of Dade County,* 161

---

[15] As explained by the Court in *Reiter*, claims for recoupment, or "the setting off against asserted liability of a counterclaim arising out of the same transaction," are "generally not barred by a statute of limitations so long as the main action is timely." *Id*. at 264.

B.R. 532, 544 (Bankr. S.D. Fla. 1993). Another factor is "whether, during the delay, there has occurred a change in conditions that would render it inequitable to enforce the right asserted." *Brumby v. Brumby,* 647 So. 2d 330 (Fla. 4th DCA 1994).

The Lessors have not proven that they have been prejudiced by the delay or that there has been a change in conditions that has prevented them from fully arguing their case. Nor have the Lessors indicated that evidence has been lost or damaged by the passage of time. On the contrary, the Lessors have been provided a full and fair opportunity to present a case as to the reasonableness of the Lease. Having failed to establish prejudice, the Lessors cannot assert that the Association's defense of unconscionability is barred by laches. For nearly a decade the Association was a dissolved entity. The Partnership paid the Lessors the amount due under the Lease until September 2008. (5/18/09 Tr. 74:20-75:6.) As such, the Court concludes that the Partnership's history of paying the rent excuses any delay in the Association's assertion of the unconscionability defense. *See In re Biddiscombe Int'l, LLC*, 392 B.R. 909, 917 (Bankr. M.D. Fla. 2008) (holding that the equitable defense of laches is not applicable to a party that comes to court with unclean hands).

## CONCLUSION

For the foregoing reasons and for the reasons stated on the record in open court on August 10, 2009, the Debtor's objections to Claim No. 16, Claim No. 19, Claim No. 20, and Claim No. 21 should be sustained and such claims should be disallowed. Merrill and Field's Motion for Allowance and Payment of Administrative Rent Claim should be denied.[16] The Association's request for declaratory relief that the Recreational Facilities Lease is unconscionable as a matter of law should be granted. Accordingly, it is

---

[16] A separate order in the main bankruptcy case will be entered denying this motion.

**ORDERED**:

1.      The Debtor's Objection to Claim No. 16 of Colony Beach, Inc. is sustained and Claim No. 16 is disallowed in its entirety.

2.      The Debtor's Objection to Claim No. 19 of William W. Merrill, Trustee of the William W. Merrill Revocable Trust, is sustained and Claim No. 19 is disallowed in its entirety.

3.      The Debtor's Objection to Claim No. 20 of Carolyn L. Field, Trustee of the Carolyn L. Field Family Trust, is sustained and Claim No. 20 is disallowed in its entirety.

4.      The Debtor's Objection to Claim No. 21 of Colony Beach, Inc. and Colony Beach & Tennis Club, Inc. is sustained and Claim No. 21 is disallowed in its entirety.

5.      The request of the Association seeking declaratory relief that the Recreational Facilities Lease is unconscionable as a matter of law asserted in Count II of the Amended Complaint is granted.

6.      Without any determination of the rights of individual Unit Owners, the request of the Association seeking declaratory relief that the rent escalation clause contained in the Recreational Facilities Lease is void and unenforceable as a matter of law asserted in Count III of the Amended Complaint is denied.

7.      A separate Final Judgment will be entered consistent with this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida on <u>January 15, 2010</u>.

_____
K. RODNEY MAY
United States Bankruptcy Judge